**Pamela Ann LOEBNER, Respondent,**

v.

**Jon Michael LOEBNER, Appellant.**

**No. ED 79638.**

Missouri Court of Appeals,
Eastern District,
Division One.

March 26, 2002.

John D. Schneider, Stephen A. Walsh, John D. Schneider & Assoc., LLC, St. Louis, MO, for appellant.

Christopher Karlen, Husch & Eppenberger, LLC, Clayton, MO, for respondent.

PAUL J. SIMON, Judge.

Jon Loebner (father) appeals the judgment of the Circuit Court of St. Louis County, entered in favor of Pamela Loebner (mother), denying his Motion for Order to Prevent Relocation of Minor Child and his Motion for Contempt, and modifying his visitation rights with respect to their daughter, Rebecca (daughter). On appeal, father contends that the trial court erred in restricting his visitation rights because: (1) applicable Missouri case law dictates that a court shall not restrict a party's visitation rights where neither party requests such a restriction and where no evidence exists that a parent is unfit, in that in this case neither party requested such a restriction and no evidence exists that either parent is unfit; (2) Section

452.400.2 RSMo (2000) (all further references herein shall be to RSMo 2000 unless otherwise noted) dictates that a court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger the child's physical health or impair the child's emotional well-being, in that the court made no such finding and no evidence of record supports such a finding; and (3) "applicable Missouri statute" requires that any modification of visitation is to be undertaken only upon the court's finding that modification is in the best interest of the child, in that the court's modification is not in the child's best interest because the modified visitation schedule effectively prevents the minor child from celebrating Jewish holidays with father "in the manner traditional to that faith." Father further argues that the trial court erred in overruling his motion for contempt in that applicable Missouri case law dictates that where a party establishes a prima facie case of contempt, the court must find the opposing party in contempt "unless she demonstrates that the action complained of was not intentionally and contumaciously brought about by her conduct, in that [father] established that [mother] intentionally and knowingly violated the sections of the Missouri statute and the parenting plan which require sixty days prior notice, and require a party not to move once a motion to prevent has been filed, and in that [mother] presented no evidence that her violative relocation was other than intentional and contumacious." Finally, father argues that the trial court erred in changing daughter's school district from Pattonville to Fort Zumwalt because applicable Missouri statute requires that the court consider the best interests of the child in order to change a child's school district placement, in that the weight of the evidence demonstrated that changing daughter's school district was not in her best interest. We affirm in part and reverse and remand in part.

The judgment will be affirmed unless it is unsupported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Langdon v. Langdon,* 792 S.W.2d 645, 646 (Mo. App. E.D.1990). We review the evidence and inferences therefrom in the light most favorable to the judgment and disregard contrary evidence. *Id.* It is the function of the trial court to decide the weight and value to be given to the testimony of any witness. *Id.* Further, "we defer to the trial court even if the evidence could support a different conclusion." *Id.*

The record reveals that on August 20, 1999, the St. Louis County Circuit Court entered judgment dissolving the marriage of father and mother and awarding them joint legal and physical custody of their five year-old daughter, born July 21, 1994. In compliance with the requirements of Section 452.377.11, the judgment provided, *inter alia:*

12. Absent exigent circumstances as determined by a court with jurisdiction, you, as a party to this action, are ordered to notify, in writing by certified mail, return receipt requested, and at least sixty days prior to the proposed relocations, each party to this action of any proposed relocation of the principal residence of the child, including the following information:

(1) The intended new residence, including the specific address and mailing address, if known, and if not known, the city;

(2) The home telephone number of the new residence, if known;

(3) The date of the intended move or proposed relocation;

(4) A brief statement of the specific reasons for the proposed relocation of the child; and

(5) A proposal for a revised schedule of custody or visitation with the child.

\* \* \*

Your failure to obey the Order of this Court regarding the proposed relocation may result in further litigation to enforce such Order, including contempt of court. In addition, your failure to notify a party of a relocation of the child may be considered in a proceeding to modify custody or visitation with the child. Reasonable costs and attorney fees may be assessed against you if you fail to give the required notice.

Attached to the judgment was a Parenting Plan, which provided, in pertinent part:

A/B.1. Custody, visitation and residential time for the minor child with each parent shall be at such times as the parties shall agree. In the event that the parties cannot agree, [f]ather shall have physical custody of the child in alternating weeks from Thursday after school or at 4:00 p.m. through Monday at 9:00 a.m., and in the alternate weeks, from Thursday after school or at 4:00 p.m. through Friday at 9:00 a.m., or such other night that is mutually agreeable to the parties. In addition, [f]ather shall be able to pick the child up from school or day care each weekday and keep her until 6:30 p.m., at which time he will return her to [m]other's home. Mother shall have physical custody of the minor child at all times not awarded to [f]ather.

2. The parties have agreed that the minor child shall be raised in the religion of Judaism. Father shall have custody or visitation with the child for the purposes of said child attending religious school or services on Sunday mornings, except that [m]other may elect to take the child to such religious school or services during periods that she has custody. If she elects not to do so, she shall give [f]ather at least 12 hours advance notice of his opportunity to pick up the child. Mother may travel out of town with the minor child on Sundays up to 4 times per year during her weekends of custody, even if this requires the child to miss religious school.

\* \* \*

*D. Holidays*

\* \* \*

2. Father shall have custody or visitation with the minor child during the Jewish Holidays of Passover, Purim, Rosh Hashanah, Yom Kippur, Succoth, and the eight (8) nights of Chanukah from 4:30 p.m. until 8:30 p.m., or alternatively, at [father's] election, any three (3) overnights during Chanukah. Father shall have custody of the minor child on [f]ather's birthday and Father's Day each year, from 9:00 a.m. until 8:00 p.m., plus Holiday Group A in odd-numbered years and Holiday Group B in even-numbered years, except that [m]other will have custody each year from December 24th at 2:00 p.m. to December 26th at 9:00 a.m., regardless of whether or not Chanukah includes those dates.

On November 4, 1999, the parties stipulated to entry of a consent judgment amending the prior judgment, which provided, in pertinent part:

4. The 1st sentence of Paragraph D.2 of Appendix A to the Parenting Plan incorporated into the Judgment/Decree of Dissolution entered August 20, 1999 is hereby deleted and the following shall be substituted in lieu thereof: "D.2. Father shall have custody of the minor child during the

Jewish Holidays of Passover, Purim, Rosh Hashanah, Yom Kippur and Succoth each year, from 4:30 p.m. on the day before the holiday until 8:30 p.m. on the day of the holiday. In the event that any of these holiday custody periods fall on an overnight that would have been [mother's] overnight, [father] shall notify [mother] in writing at least seven (7) days prior to the holiday of a substitute overnight period for mother to have, within one week of the holiday. In addition, [f]ather shall have custody of the minor child for Chanukah each year from 4:30 p.m. until 8:30 p.m. on each day of Chanukah, or alternatively, at [father's] election, any three (3) overnights during Chanukah."

The second sentence of the original paragraph D.2 shall remain unchanged.

On April 28, 2000, mother sent a letter via certified mail, return receipt requested, to father at his residence in Maryland Heights, Missouri, informing him that she was "in the process of purchasing a house and [would] be relocating to St. Peters, Missouri," from her residence in Bridgeton, Missouri. The letter listed the address of the new house, indicated that the date of the intended move would be June 1, 2000, and further provided:

The reason for the relocation is that because we live near the airport and the government is buying up so many of the homes, I do not feel the area is very stable. I was able to find a house in the St. Peters' [sic] area that met my criteria and that I could afford. It has a nice big backyard for [daughter] to play in and I believe the security of knowing this is our home will bring more stability to her.

As far as proposing a revised custody schedule, I propose to leave the schedule the way it currently stands.

On May 5, 2000, father filed an Affidavit and Motion Under Section 452.377.7 for Order to Prevent Relocation of [Daughter], in which he argued that the written notice he received from mother "was not at least sixty days in advance of the proposed relocation" as required by Section 452.377.2, the relocation would "effectively prevent" his exercise of his visitation rights as set forth in the parenting plan, and that the relocation would "destroy virtually every opportunity [he] might have to continue his close relationship with his daughter" because: (1) the relocation would place daughter at a great distance from father's residence and cause extensive driving time especially during rush hour, thereby eliminating time father could spend with her; (2) "under the Judgment," father picked daughter up from school at 4:30 p.m. each weekday and returned her to mother's home at 6:30 p.m., but given the relocation, father could not pick up daughter until between 5:00 and 5:30, further reducing his time spent with her "each day;" (3) "under the Judgment," daughter spent Thursday nights with father and father, who was required to be at work at 7:30 a.m., left daughter off at school at 7:00 a.m., but given the relocation, father and daughter would be required to awaken at 5:00 in the morning so that father could get to work on time; and (4) on alternating weekends, the same problem mentioned in item (3) would arise on Friday and Monday mornings. Father next argued that the relocation would render his having Sabbath dinner with his family on Fridays during alternate weekends impossible and take daughter away from her extended family, friends, and playmates, and that the relocation was unnecessary as there was no shortage of homes available in the

"present area where the parties live and in the Pattonville district."

On May 22, 2000, Mother filed a response to father's motion, in which she admitted that the written notice "was not at least sixty days in advance of the proposed relocation," but denied the remainder of father's motion. Mother argued that the relocation was in the best interests of the child because: (1) daughter would be living in a house instead of an apartment; (2) the home was only fifteen miles further away from father's residence than her prior residence; (3) mother could not afford a comparable home in Maryland Heights; (4) it was "impractical (if not impossible) for mother to obtain the agreement of a seller to accept an offer to purchase a home contingent on father's not filing an objection to mother's relocation" and that "as such, [mother] had no alternative but to sign a sale contract to purchase [the new house] and subsequently advise [father];" and (5) she bought a home within a "reasonable distance" of father's home so as not to disrupt the parties' custody schedule. The response further provided that mother did not believe that it was necessary to alter the custody schedule set forth in the amended judgment.

On June 1, 2000, mother and daughter relocated to St. Peters. Seven days later, father filed a motion for contempt in which he argued that mother "willfully, deliberately, and intentionally" violated the amended judgment by relocating daughter's primary residence without providing the requisite 60 days notice and over father's objection. Father further argued that mother's actions were "contumacious and in total and complete disregard of the Orders and Decree of this Court, and the mandate of the applicable statutes, and clearly .... a contempt of this Court." The trial court issued mother an order to show cause.

On August 24, 2000, a hearing was held on father's contempt motion and motion to prevent relocation, at which mother testified as to why she relocated despite father's objection. Mom testified that, prior to the relocation, mother lived with both daughter and another daughter (a sophomore in high-school born of a prior marriage) in a rented two-bedroom townhouse in Bridgeton, Missouri, which was located in the Pattonville school district. When asked how crowded her prior residence was, mother responded: "Well, it wasn't a home. I mean we had two bedrooms and I had to put the oldest one in the basement." At that time, mother made little over $30,000 annually.

Mother did not wish to remain in the area because the government "was buying the area out, the homes were going to lose their value," and "a lot of the homes [were] rundown." After signing a lease for a second year in the townhouse, she began looking for a new residence. Mother's prime concerns in this search were price, school district quality, proximity to mother's parents and to father, stability of the neighborhood, and whether or not the house had a yard.

Mother considered homes in several areas, including Maryland Heights. She could not afford to purchase the residence she was looking for in Maryland Heights. Mother eventually settled on the house in St. Peters, located in the Fort Zumwalt school district.

Mother investigated the school district by making phone calls to several people, including her best friend, who had children of their own in the school district; and to the chamber of commerce and her realtor. Mother inquired as to teacher turnaround, the duration the school was in operation, the student-teacher ratio, the availability of a latchkey program, and the curriculum. She also visited the school, which had been

built two years earlier, and "met the first grade teacher."

When asked why changing daughter's school was in her best interest, mother responded:

> We've just moved. We've only been here a few months, and my ex-husband has testified that there are friends on the street that she knows and there are friends that she plays with.

> I would like for [daughter] to have the opportunity to meet children that are in my subdivision and that go to the Rock Creek Elementary School so we can have more children coming over, and she would have an opportunity to make lifetime friends where I currently live.

> She has already made friends and knows people over there.

Mother further testified that she signed the contract for the new house on April 8, 2000, and her loan was approved on the 27th of that month. The next day, she sent the letter advising father of her intent to relocate and let father know of her plan in person. She scheduled to close on the residence on May 28th, because that was daughter's last day of school and she wanted to make sure father had enough notice "because we are going into the summer schedule, that the custody schedule and arrangements wouldn't be disrupted."

When questioned as to advantages she saw in her new residence, mother responded: "It's a stable environment, it's a home, we know our neighbors, we met our neighbors. [Daughter] needs children in the block. You're not going to have someone knocking on your door in the middle of the night that's drinking, you know." She added that the new house had three bedrooms, a basement, a backyard, and a "real nice jungle gym."

Mother testified that her new home was 19.8 miles from father's home, most of which was highway driving, that it took about thirty minutes to travel between the two locations, and that it used to take from 10 to 15 minutes to drive from her Bridgeton residence to father's home in Maryland Heights.

When asked if the purchase of the new residence had anything to do with her "wanting to deny [her] former husband custody of [daughter]" or "hurting the relationship with each other," mother responded that it did not. Mother further stated: "I looked at several homes. . . . This isn't the first house I put a contract on either," and "I didn't think it was necessary to cause a problem each and every time I went someplace."

As to the timing of mother's notice to father, mother stated on cross examination:

> Until you get your building inspection and your financing secured and all the information, I didn't realize that I'm supposed to every time I look at a house or put a contract on it. I thought it was once you knew. I thought it was once you knew you were going to be moving, and once you knew your new address and you knew everything was going to be fine, that you would do that. I didn't think it was necessary to cause a problem each and every time I went someplace.

At the end of the hearing, the court stated from the bench:

> I've reviewed basically the evidence that occurred through the testimony.

> I'll say that probably in many cases we don't have a father as active as [father] in the raising of this young child. I think that's extremely important.

> It's been a very difficult decision in order to keep that, keep that relationship, and keep that male influence in

[daughter's] life, which I consider extremely important.

I have also reviewed [mother's] ability to move out of a rental unit into at least a house and better stability from that perspective.

So this ruling won't make either party probably happy, but I feel it's in the best interests of [daughter].

The court then orally proposed changes to the visitation schedule.

On October 11, 2000, the trial court entered its judgment on a pre-printed Family Court Modification Judgment form, in which a box was checked next to the language: *"Sustained:* (Respondent's) [Father's] Motion to Modify prior judgment is heard and SUSTAINED." Under the printed heading "Child Custody and Visitation," a box was checked next to the following printed language:

The Court finds that a change in circumstances has occurred in the child or the child's custodian which makes a modification necessary to serve the best interest of the child. Therefore, the court modifies the judgment of dissolution heretofore granted on [August 20, 1999] in regards to visitation as follows: *

The asterisk identified an attached exhibit, which provided: .

Section A./B.1. of Appendix A: Physical Custody is hereby deleted and in its place the following new section A./B.1. shall be inserted:

A./B.1. Custody, visitation and residential time for the minor child with each parent shall be at such times as the parties shall agree. In the event that the parties cannot agree, [f]ather shall have physical custody of the child:

(i) in alternating weeks beginning September 30, 2000 from Thursday after school or at 4:00 p.m. until Sunday at 6:00 p.m. when the child shall be returned to [mother's] residence. Father shall be responsible for transportation during these custody periods.

(ii) On Fridays not included in (i) above from Friday after school or at 4:00 p.m. when [f]ather shall pick up the child until Saturday at 11:15 a.m. when [m]other shall pick up the child from [f]ather's residence. Mother may exclude four (4) Fridays per calendar year (two [2] in calendar year 2000) provided she give [father] ten (10) days advance written notice of same. Mother shall also be entitled to custody of the child on Fridays during her designated weeks of custody in the Summer (Section C herein) and on Fridays which occur on her holidays and special days pursuant to Sections D.1. and 3. herein. ˙

(iii) On Tuesdays and alternating Thursdays from after school or at 4:00 p.m. until 8:30 p.m. [father] shall be responsible for transportation at the beginning of these custody periods. Mother shall be responsible for picking the child up at [father's] residence at the conclusion of these custody periods.

The child shall attend school in the Fort Zumwalt School District.

The following shall be added to Section D.2. of Appendix A: Physical Custody:

Father's custody on holidays and special days which occur on days the day before a school day shall conclude at 8:30 p.m. Father shall return the child to [mother's] residence on such days. Father shall have custody on Yom Kippur from sundown at the beginning of the holiday until sundown at

the end of the holiday. Father shall be responsible for transportation for the Yom Kippur holiday.

The parties shall cooperate completely with regard to the child being in counselling [sic] with Jan Brautigan (the child's current counselor) or any other counselor selected by the parties.

Finally, inserted on the form under the printed heading "Other Orders" was the following: "Respondent's [Father's] Motion for Contempt is denied."

The "Family Court Modification Judgment" form utilized by the trial court should be used in entering a judgment pursuant to Sections 452.377.12 and 452.410, but not in this proceeding.

On November 13, 2000, father filed a Motion to Correct or Amend the Judgment, or Alternative Motion for New Trial, alleging that the trial court erred by: (1) impermissibly reducing father's visitation rights in that neither party requested a reduction or limitation in visitation rights and no evidence existed that either parent was unfit in violation of Section 454.400.2; (2) impermissibly restricting father's previously ordered visitation rights without making a finding that such visitation endangered the health or impaired the emotional development of the child and upon no evidence for such a finding in violation of Section 454.400.2; and (3) entering an order restricting father's visitation time with regard to the child's upbringing in the Jewish religion, in that the order at issue effectively precluded father from celebrating Jewish holidays with the child in the manner "traditional to [the Jewish] faith (i.e., from sundown to sundown)," against the weight of the evidence and upon no showing that such restriction was in the child's best interest. Father further argued that the court abused its discretion in changing the school district of the child without a finding or showing that such change would be in the best interest of the child. The motion provided that "each of these errors arise as a result of the Court's action in changing the school district of the child, in that, were the child still attending the school district she attended before [mother] precipitously and contumaciously moved her residence, no restriction of [father's] visitation time would have been called for." Father requested an amendment or correction to the judgment reinstating child's enrollment in the Pattonville school district and reinstating his previously-ordered visitation time, or alternatively a new trial.

On April 17, 2001, more than five months later, the trial court entered a Judgment and Order overruling father's Motion for New Trial on the issue of transfer of residence, but finding that father "ha[d] raised issues requiring rehearing concerning restriction of [father's] previously ordered temporary custody and visitation and, in that regard, issues related to alleged restriction of [father's] ability to raise the minor child in the Jewish faith and to celebrate holidays in the manner traditional thereto, and the propriety of transferring the minor child's school enrollment," and granting father's Motion for Re-hearing "as to those issues." Further, the judgment provided, "The Court, upon its own motion, recuses itself from the rehearing of said matters, and hereby transfers the case to the Presiding Judge of the Family Court for reassignment." However, pursuant to Rule 78.06, father's motion had already been deemed denied ninety days following the November 13, 2000 filing. We granted father leave to file a late Notice of Appeal.

In his first point on appeal, father argues that the trial court erred "in restricting [his] visitation rights, because applicable Missouri case law dictates that a court shall not restrict a party's visitation rights

where neither party requests such a restriction and where no evidence exists that a parent is unfit, in that in this case neither party requested such a restriction and no evidence exists that either parent is unfit." Father contends that, pursuant to the amended judgment, he was awarded visitation with daughter in the amount of 137 hours per two-week period, that said amount was reduced to 102.75 hours pursuant to the modification, and that such "reduction or limitation" was an error in absence of evidence that father was unfit and given the fact that neither party requested a modification.

Essentially, in father's first point he contends that the trial court's reduction of his visitation rights "restricted" those rights. The amended judgment provided father with 123.5 hours of visitation with daughter per average two-week period. As modified, however, father's visitation was reduced 16.75 hours to 106.75 hours for the same period. Therefore, it is imperative to discern whether this reduction constituted a "restriction" of father's visitation rights under Section 452.400.2, which provides in pertinent part:

2. The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child, but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger the child's physical health or impair his emotional development.

\* \* \*

Our Supreme Court in *Turley v. Turley*, 5 S.W.3d 162, 164–165 (Mo.banc 1999), resolved a conflict as to the meaning of the term "restrict" in Section 452.400.2. In *Turley*, Ms. Turley filed a motion to modify Mr. Turley's visitation rights granted under a prior separation agreement. *Id.*

at 163. The trial court subsequently modified the "Original Judgment and Decree of Dissolution of Marriage" (sic) by ordering Mr. Turley, who lived on a family farm located approximately 168 miles from Jefferson City, to confine future visitation with his children to Jefferson City, where Ms. Turley resided, during the months of December, January, and February. *Id.* at 164. Mr. Turley argued that the trial court erred in restricting his visitation rights without finding that his children's physical health was endangered or their emotional development impaired by the previous arrangements. *Id.* Ms. Turley argued that Mr. Turley's visitation rights were not "restricted" under Section 452.400.2 because the time he could spend with his children was not reduced. *Id.* The Supreme Court reversed and remanded, holding that the confinement of Mr. Turley's visitation to Jefferson City for three months per year constituted a "restriction" under Section 452.400.2. *Id.* at 165.

In reaching its conclusion, the Supreme Court discussed the disagreement among the courts of appeal, noting that some cases required an "entire restriction" of visitation rights before the "restriction" language of Section 452.400.2 was activated, and that other cases simply required a "new restriction" not present in the original agreement. *Id.* at 164, 165. The Court stated:

The term "entire restriction" does not appear in the text of [Section 452.400.2] and is, at least, confusing. The cases in which the term is found seem to be limited to those where a modified visitation order reduced or eliminated visitation periods but where there remained substantial opportunities for unrestricted visitation by the non-custodial parent. [Citations omitted.] To the extent those cases relied on the notion that only an

"entire restriction" requires specific findings under [Section 452.400.2], they are overruled.

*Id.* at 165.

The Court next proceeded with a plain-language analysis of the term "restrict" utilizing its definition found in *Webster's Third New International Dictionary* 1937 (1981), i.e., " 'To set bounds or limits to' or 'to check, bound, or decrease the range, scope or incidence of.' " *Id.* The Court held: "For [Section] 452.400.2 to apply, the modification must restrict or limit one party's visitation rights compared to their visitation rights under the original agreement." *Id.*

■ We recognize that the Supreme Court in *Turley* left open the question of whether the "shortening or elimination of a visitation period" rose to the level of a restriction within the meaning of Section 452.400.2. *Id.* at 165 n. 2. However, we conclude that, pursuant to the definition of "restrict" in *Turley* as well as the Court's holding that Section 452.400.2 applies when a modification restricts or limits one party's visitation rights compared to their visitation rights under an original agreement, the reduction in father's visitation hours was a restriction under 452.400.2. The reduction certainly "set bounds or limits to" and "decreased the range, scope, and incidence of" father's visitation rights under the amended judgment.

While the trial court's modification of the amended judgment may have been in daughter's best interests, we are bound by *Turley* and the plain language of Section 452.400.2. The modification of the amended judgment reduced father's hours of visitation with daughter by 16.75 hours per two-week period. Such reduction is a restriction under Section 452.400.2 and, thus, it was necessary for the trial court to make a finding as to whether the original visitation would endanger daughter's physical health or impair her emotional development. *Turley* at 165; Section 452.400.2.

As our discussion of father's first point is likewise dispositive of his second point, we address father's third point, in which he argues that the trial court erred in restricting his visitation rights because applicable Missouri statute requires that any modification of visitation is to be undertaken only upon the court's finding that modification is in the best interest of the child, in that the court's modification is not in the best interest because the modified visitation schedule effectively prevents the minor child from celebrating Jewish holidays with her father in "the manner traditional to that faith."

Once again it is necessary to determine whether the modification of father's visitation rights with respect to the holiday portion of the amended judgment constituted a restriction under Section 452.400.2, thereby requiring a finding as to whether daughter's physical health or emotional development would have been impaired by continuing under the amended judgment. Pursuant to the amended judgment, father's visitation "during" enumerated Jewish holidays began at 4:30 p.m. "on the day before the holiday" and ended at 8:30 p.m. "on the day of the holiday." Under the modification, visitation "on [those] holidays," with the exception of Yom Kippur, "which occur on days the day before a school day shall conclude at 8:30 p.m." On Yom Kippur, father was to have custody of daughter "from sundown at the beginning of the holiday until sundown at the end of the holiday."

The modification with respect to Jewish holidays is ambiguous and can be reasonably interpreted two ways: One interpretation is that father's visitation rights have been reduced to four hours from twenty-eight hours on Jewish holiday two-day periods other than Yom Kippur, where the day prior to the holiday falls on a day

before school, and the other interpretation essentially makes no modification to the amended judgment because visitation on Jewish holidays ended at 8:30 p.m. anyway under the amended judgment. Since we are reversing and remanding the judgment for reconsideration of the trial court's judgment with respect to the reduction of father's hours of visitation, the trial court may correct any confusion as to father's visitation on Jewish holidays.

In his fourth point on appeal, father argues that the trial court erred in overruling his motion for contempt "in that applicable Missouri case law dictates that where a party establishes a prima facie case of contempt, the Court must find the opposing party in contempt unless she demonstrates that the action complained of was not intentionally and contumaciously brought about by her conduct," in that father established that mother intentionally and knowingly violated the sections of the Missouri statute and the parenting plan which require sixty days prior notice, and require a party not to move once a motion to prevent has been filed, and in that mother presented no evidence that her violative relocation was other than intentional and contumacious.

There is no dispute that mother violated Sections 452.377.2 and 452.377.7, Relocation of Children, by failing to give father the requisite 60 days notice prior to her relocation and relocating despite father's submission of a motion to prevent relocation. Further, Section 452.377.12 provides, in pertinent part:

Violation of the provisions of this section or a court order under this section may be deemed a change of circumstances under section 452.410, allowing the court to modify the prior custody decree. In addition, the court may utilize any and all powers relating to contempt conferred on it by law or rule of the Missouri supreme court.

A finding of contempt for failure to obey a court order is not justified absent a clear showing that a party bound by such order willfully and contumaciously refused to obey the order. *In Re Marriage of Greene*, 711 S.W.2d 557, 563 (Mo.App. S.D.1986). Whether non compliance shall be punished as contempt lies within the trial court's discretion. *Id.* at 562.

Father argues that "the record contains no testimony or other evidence that [mother] had any excuse or suffered any exigent circumstances such as might lead the Court to believe that her conduct in relocating without the required notice and hearing was anything other than deliberate and contumacious." Since the trial court did not hold mother in contempt, it apparently found in its discretion that mother's conduct was not willful and contumacious. We find substantial evidence supporting the trial court's exercise of its discretion. The day after signing the contract for her new house, mother notified father both by letter and personally of her intent to move, and also notified father of the reasons for the proposed relocation. Mother testified that she scheduled to close on the house on May 28th because it was daughter's last day of school, and that the purchase of the new residence had nothing to do with her "wanting to deny [her] former husband custody of [daughter]" or "hurting the relationship" between father and daughter. The new residence was located at most 20 minutes further from father's house and at least 15 minutes further from father's house than her old residence. Mother's testimony regarding the original order indicated that she did not fully understand the notice requirement in that she thought, "I didn't realize that I'm supposed to every time I look at a house or put a contract on it. I thought it was once you knew. I thought it was once you knew you were going to be moving. . . ." Mother's testimony that the new residence was not the first house she con-

tracted to buy further supports her testimony. Further, we defer to the trial court's determination as to the credibility of mother's testimony, as it was "entitled to believe or disbelieve all, part, or none of the testimony of any witness." *McDaniel v. McDaniel*, 982 S.W.2d 729, 731 (Mo. App. E.D.1998). The trial court's denial of father's motion for contempt was not an abuse of discretion.

In his fifth point, father argues that the trial court erred in changing his daughter's school district from Pattonville to Fort Zumwalt because applicable Missouri statute requires that the court consider the best interests of the child in order to change a child's school district placement, in that the weight of the evidence demonstrates that changing the child's school district was not in her best interest. Father argues that "there is nothing in the record which suggests that the parties' child needed to be removed from the Pattonville district she had been attending and placed in the Fort Zumwalt district."

■ Section 452.400.2 provides that a court may modify an order granting or denying visitation rights whenever such modification would serve the best interests of the child. We find substantial evidence that the trial court's modification, insofar as it changed daughter's school district from Pattonville to Fort Zumwalt, was in her best interests.

Prior to purchasing her new residence, mother investigated the school district by talking to people with children in the district, the chamber of commerce, and her realtor; inquiring as to teacher turnaround, student-teacher ratios, the age of the school, availability of latchkey programs, and school curriculum. Mother visited the school and "met the first grade teacher." Mother testified that she wanted daughter to have the "opportunity to make lifetime friends" in the area of the new residence and that daughter "has al-

ready made friends and knows people over there."

Father contends that the fact mother had to travel past the Pattonville school on her way to work in the morning evidenced that attendance at the Fort Zumwalt school was not in daughter's best interests. Father does not show how the fact that mother drove past the Pattonville school on her way to work rendered daughter's attendance at the Fort Zumwalt school not in daughter's best interest.

Finally, father contends that daughter performed well at the Pattonville school, father and daughter's grandfather were active in the Pattonville school, daughter had friends in the area of her former residence, and the Pattonville school district had a lower teacher to student ratio than the Fort Zumwalt district. Daughter's positive performance at Pattonville does not indicate that her performance would suffer at Fort Zumwalt. Further, transfer of daughter from Pattonville to Fort Zumwalt would hopefully not cause her grandfather and father to abandon activity in her schooling. While it is true that daughter had friends in the area of her former residence, we are not convinced that she cannot continue those friendships while fostering new friendships in the area of her new residence and at the Fort Zumwalt school. Finally, a lower teacher to student ratio at Fort Zumwalt does not mandate that attendance at the school would not be in daughter's best interest given the substantial evidence to the contrary. Point denied.

Judgment affirmed in part and reversed and remanded in part.

WILLIAM H. CRANDALL, JR., P.J., and ROBERT G. DOWD, JR., J., concur.